IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:17-cv-01033

JANET WILSON, and

EASTSIDE ACTION SUPPORT TEAM,

Plaintiffs,

        Plaintiff,

v.

THE CITY OF PUEBLO, COLORADO, a municipal corporation, and

LUIS VELEZ, individually, and in his official capacity as Chief of Police for the City of

Pueblo, Colorado,

        Defendants.

---

### COMPLAINT AND JURY DEMAND

---

# INTRODUCTION

This is a civil rights lawsuit for money damages brought by the Plaintiffs Janet Wilson and Eastside Action Support Group (E.A.S.T.) against Luis Velez and the City of Pueblo, Colorado arising out of a planned but not allowed May 2, 2015 Cinco de Mayo Parade on Pueblo, Colorado's eastside.

# JURISDICTION AND VENUE

1) This action arises under the First and Fourteenth Amendments to the United States Constitution and under the Civil Rights Act of 1871, 42 U.S.C. §§1983 and 1988.

2) Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(3) in that the controversy arises under the United States Constitution and under 42 U.S.C. §1983. This Court has authority to award attorneys fees pursuant to 42 U.S.C. §1988.

3) Venue is proper under 28 U.S.C. §1391 in that all events alleged in this complaint occurred within the Federal District of Colorado.

# THE PARTIES

4) Plaintiff Eastside Action Support Team, known as "E.A.S.T.," is a non-profit corporation organized under the laws of the State of Colorado and has Section 501(c)(3) status under the Internal Revenue Code as a public charity.

   a) Pueblo's eastside is an economically disadvantaged area, with the median income levels for the four census tracts making up Pueblo's eastside ranging between eighteen thousand and twenty-five thousand dollars a year.[1]

   b) E.A.S.T.'s commitment is to improving and beautifying Pueblo, Colorado's eastside community, improving the public's security and safety, easing

---

[1] Per a compilation of 2010 Census and the 2011-2015 American Community Survey data by www.justicemap.org.

neighborhood tensions, and bringing awareness to the public of the eastside's cultural richness and diversity.

5) Plaintiff Janet Wilson makes her permanent home on the eastside of Pueblo, Colorado.

    a) Plaintiff Janet Wilson, is a founder of E.A.S.T and was a member of E.A.S.T.'s Board of Directors in 2015.

    b) Plaintiff Janet Wilson is also a founder of "Occupy the Roads," a 501(c)(4) entity whose mission is to get the money out of politics.

    c) Plaintiff Janet Wilson is a founder of another 501(c)(3) non-profit, Pueblo House, whose mission is to empower the local community through education, music, art, gardening and media, and which is a community of people driven to be the change that inspires a neighborhood in decline to renew itself and help its people.

6) Defendant City of Pueblo, Colorado (after this, referred to as "the City," or "Defendant City") is a municipal corporation organized under Article XX of the Constitution of the State of Colorado and as such is a "person" subject to suit within the meaning of 42 U.S.C. §1983.

7) Defendant Velez is an adult domiciled in the State of Colorado, and for all times material to this complaint, was acting in his individual capacity and in his official capacity as Chief of Police of the City of Pueblo, Colorado, and under color of law.

# STATEMENT OF FACTS

## The City of Pueblo, Colorado

8) On April 6, 1954, the people of Pueblo, Colorado voted to approve and adopt the "Charter for the City of Pueblo, Colorado," after this referred to as "the Charter." Exhibit 1 contains portions of the Charter pertinent to this Complaint.

9) The Charter states that the City of Pueblo "shall have all the powers granted to municipal corporations and to cities by the Constitution [of the State of Colorado] and general laws of this State together with all the implied powers granted."

10) The Charter adopted the Council-Manager form of government.

11) The Charter states in Section 1-2 that "[p]ursuant to its provisions and subject only to limitations imposed by the State Constitution and by this Charter, all powers of the City shall be vested in an elective council."

12) The elective council contemplated by the Charter is known as the City Council.

13) Under Section 3-5 of the Charter, the City Council has "all legislative powers and functions of municipal government conferred by general law, except as provided in [the] Charter."

14) Section 3-16 of the Charter states that "[i]n all legislative matters coming before it, the Council shall act only by ordinance, resolution or motion."

15) Section 3-22 of the Charter requires that the City Council annually codify the permanent ordinances. This codification is known as the Pueblo Municipal Code (after this, referred to as "the Code" or "the PMC").

## The City of Pueblo's Parade Permitting Ordinance

16) Section 3-13 of the Charter, as amended on November 6, 1973, permits the City Council to provide for the issuance, suspension or revocation of licenses and permits and fees therefor, for regulatory or revenue purposes.

17) Per Section 15-1-1 of the Code, Defendant City of Pueblo, through the powers vested in the City Council, adopted the Model Traffic Code for Colorado Municipalities "for the purpose of regulating vehicular and pedestrian traffic within the City, including permits, procedures and penalties."

18) Section 15-1-8(a)(14), Part 13, Sec. 1301, of the Code, entitled "Parades and Funerals," created a permitting scheme for the regulation of parades occurring in the City of Pueblo.

19) On March 27, 2017, the Pueblo City Council substantially modified the permitting scheme by adopting Ordinance No. 9111. Ordinance No. 9111 repealed and replaced Part 13, Sec. 1301 of Sec. 15-1-8(a)(14).[2] However, by its terms Ordinance No. 9111 became effective on April 26, 2017 and therefore does not apply to this case.

20) Dan Kogovsek, Pueblo City Attorney, announced during the March 27, 2017 public hearing on Ordinance No. 9111, at a regular meeting of the Pueblo City Council, that the reason for the new ordinance was that Pueblo's parade permitting ordinance (referencing Section 15-1-8(a)(14), Part 13, Sec. 1301, of the Code) did not, in his view, "adequately address special parades, parades that have a component dealing with the

---

[2] In the event that Ordinance 9111 is codified as Part 13, Sec. 1301 of Sec. 15-1-8(a)(14), any reference in this Complaint to Part 13, Sec. 1301 of Sec. 15-1-8(a)(14) is to the version that was repealed and replaced by Ordinance 9111.

First Amendment because, as you know, this council cannot unreasonably restrict the right of First Amendment expression in public places, including parades that are taking place in the City."

21) The permitting scheme under Section 15-1-8(a)(14), Part 13, Sec. 1301, required that anyone wishing to have a parade on a city street must first apply to the chief of police for a parade permit "not less than five days prior to the date of the proposed parade" and pay a $25 application fee at the time of filing.

22) Under Section 15-1-8(a)(14), Part 13, Sec. 1301(3)(a)-(f), the chief of police was required to grant the application when he or she found from a review of the application the presence of six factors. See Plaintiff's Exhibit 2, Section 15-1-8(a)(14), Part 13, Sec. 1301. Thus, Sec. 1301(3)(a)-(f) attempted to create specific standards for the chief to follow to prevent the chief from exercising unfettered discretion in deciding whether to approve or reject an application for a parade permit. Sec. 1301(3)(a)-(f) failed in this regard since the provisions allowing an applicant to appeal a denial of an application to City Council do not meaningfully constrain the chief or provide a meaningful review of the chief's decisions to grant or deny parade permit applications.[3]

23) Under Sec. 15-1-8(a)(14), Part 13, Sec. 1301(4), if the chief of police disapproved of the permit application, then he or she was required to notify the applicant of the reasons for the denial within two days from when the application was filed. The applicant then had ten days to file an appeal to the Pueblo City Council if the application was denied.

---

[3] See paragraph 59, below, for factual allegations supporting this assertion.

24) Sec. 15-1-8(a)(14), Part 13, Sec. 1301(5) stated that "[t]he applicant hereunder shall comply with all permit conditions and with the applicable laws and ordinances and shall carry the parade permit upon his person during the conduct of the event." On its face, Sec. 1301(5) allowed for the exercise of unfettered discretion because it contained no provision that defined who was permitted to set the conditions, nor did it contain any specific standards for the setting of conditions on a parade permit.

25) By custom, the chief of police set the permit conditions.

26) On its face, however, Section 15-1-8(a)(14), Part 13, Sections 1301(3) and (5), created the opportunity for the chief of police to exercise unfettered discretion in approving a parade permit application by setting conditions too onerous for an applicant to meet, or with conditions that were not equally applied to other applicants for other parades that were similarly situated, without any provision for appeal of the approval of the application if the chief set those types of conditions. Thus, Section 15-1-8(a)(14), Part 13, Sections 1301(3) and (5), permitted the chief of police to exercise content-based discrimination in approving or denying an application for a parade permit.

### The 2015 Cinco de Mayo Parade

27) In early 2015, Plaintiff E.A.S.T. decided to organize a Cinco de Mayo parade on Pueblo's eastside.

a)  Cinco de Mayo is a holiday that commemorates the victory of the Mexican militia over the French army at The Battle of Puebla in 1862.

b)  Cinco de Mayo is one way for people to celebrate pride in their community.

c)  A Cinco de Mayo parade had been organized and put on in the seven years immediately preceding 2015 by other organizations but before Plaintiff E.A.S.T. decided to organize a parade, there was no Cinco de Mayo parade planned for 2015.

d)  Plaintiff E.A.S.T.'s 2015 parade was organized to continue the tradition of the Cinco de Mayo parade and to celebrate Cinco de Mayo.

e)  Plaintiff E.A.S.T.'s commitment to put on the 2015 Cinco de Mayo Parade was consistent with one of its purposes of bringing awareness to the public of the cultural richness and diversity of Pueblo's eastside.

28) On March 17, 2015, Plaintiff Janet Wilson, who was a member of E.A.S.T.'s executive board, and Cynthia K. Rand, another member of E.A.S.T.'s executive board, signed and submitted to the Pueblo Police Department a "Pueblo Police Department, Traffic Division, Parade Permit Application" for a Cinco de Mayo Parade to be held on May 2, 2015. See Exhibit 3, attached.

29) Plaintiff Janet Wilson was listed on the application as the "chair" of the event and a person responsible for the event.

30) The original application listed the parade route as E. 4th Street in Pueblo. Plaintiff E.A.S.T.'s representatives were told by Pueblo Police Sgt. Howard Jackson that they would need barricades and liability insurance since the parade organizer in the prior year did not have any. Plaintiff E.A.S.T. obtained liability insurance immediately and began raising funds for what they were told was approximately $1,200 that would be needed for the barricades.

31) Subsequently, four members of Plaintiff E.A.S.T.'s board of directors met with

Defendant Velez who denied the use of E. 4th St. as a parade route for what he said

were safety reasons, although many businesses along the intended parade route were

in favor of the parade on E. 4th St. Defendant Velez demanded that the parade route be

on E. 8th St. rather than E. 4th St. Plaintiff E.A.S.T., through its representatives, chose

the E. 8th St. option for the parade route.

32) Defendant Velez subsequently stated that he required E.A.S.T. to use forty Type 3

barricades. Per the Manual on Uniform Traffic Control Devices, 2009 Edition, Chapter

6F, Temporary Traffic Control Zone Devices, a Type 3 barricade is for use on freeways,

expressways and other high speed roadways to close or partially close a road.[4]

33) Even though the parade was receiving many entrants, Plaintiff E.A.S.T. was having

difficulty raising the funds to pay for forty Type 3 barricades for use in the parade.

34) Chief Velez informed Plaintiff E.A.S.T.'s representatives that he would not permit

police officers to provide traffic control for the 2015 Cinco de Mayo Parade unless the

officers were paid time and one-half for their use. In fact, the standard parade permit

application filled out by Plaintiff Janet Wilson and Cynthia Rand contained printed

boilerplate language informing the applicant that "you and/or your organization has (sic)

agreed to reimburse the City of Pueblo Police Department for any reasonable overtime

and equipment costs that were incurred in direct support of your event."

35) On May 1, 2015, one day before the scheduled parade, Defendant Velez informed

Plaintiff Janet Wilson that he was granting Plaintiff E.A.S.T.'s application for a parade

---

[4] https://mutcd.fhwa.dot.gov/htm/2009/part6/part6f.htm#section6F68

permit after Mountain Barricade, a Pueblo company that supplied traffic control barricades, provided a letter stating they would provide barricades for the parade.

36) Defendant Velez, when he signed his approval of the parade permit, added the following "comments/stipulations" on the application:

> Must supply all appropriate traffic barricades in accordance with an approved traffic control plan.

37) On May 1, 2015, at around 4:50 pm, Defendant Velez left a voice mail for Plaintiff Janet Wilson revoking the parade permit. Defendant Velez stated on the voice mail that the barricades to be provided by Mountain Barricades were not sufficient.

38) In revoking the permit at 4:50 pm the day before the parade, Defendant Velez made it impossible for Plaintiffs to appeal his decision to the Pueblo City Council, as provided by the Code.

### The 2017 Cinco de Mayo Parade

39) Pueblo House applied for a permit to put on the 2017 Cinco de Mayo Parade. Plaintiff Janet Wilson signed as the person responsible for the parade. She did not sign up as the person responsible for the 2016 Cinco de Mayo Parade, even though Plaintiff E.A.S.T. was the applicant for the 2016 parade permit.

40) Plaintiff Janet Wilson applied for the parade permit for the 2017 Cinco de Mayo Parade before City Council ever passed into law Ordinance 9111, the ordinance that repealed and replaced Section 15-1-8(a)(14), Part 13, Sec. 1301, of the Code.

41) As with the 2015 Cinco de Mayo Parade, Defendant Velez took far longer than the two days required by Section 15-1-8(a)(14), Part 13, Sec. 1301 to either grant or deny

Pueblo House's parade permit application. Putting on a parade such as the Cinco de Mayo Parade takes a lot of planning to have the parade come off as smoothly as possible and time was drawing short to be able to make sufficient advance plans for the parade.

42) Plaintiff Janet Wilson decided to go to a regular meeting of the Pueblo City Council on April 10, 2017, to let Council know that the application had not been acted on as of that date and that she was seriously considering canceling the parade.

43) The regular meetings of Pueblo City Council are video and audio recorded and freely available 24 hours a day, 7 days a week, to be viewed by anyone with an internet connection who wishes to view the meetings.

44) Plaintiff Janet Wilson spoke to City Council during the public forum portion of the April 10th meeting regarding the delay and her frustration with the delay.

45) City Councilman Ray Aguilera, during the part of the meeting reserved for council members to comment on items before the Council and on statements made during the public forum portion of the meeting, turned to Plaintiff Janet Wilson and said the following:

> Well … uh … Janet, I'm in favor of you having your parade. But, it's kinda, it's kinda difficult to want to work with you when you're suing the City for 75,000 bucks. You know what I'm trying to say? If maybe you tried changing your personality a little bit and try to get along with everybody we could make things work. I'm going to say that. And, I do think you deserve to have your Parade. I think there should be some way that we could work that out.

46) Councilman Aguilera's recorded comments to Plaintiff Janet Wilson were not only made in public at the City Council meeting, but became freely available within a day or two on the City's website for anyone with an internet connection to view.

47) On January 31, 2017, undersigned counsel sent a settlement offer to the City of Pueblo to resolve Plaintiff Janet Wilson's claims of a First Amendment violation arising from Defendant Velez's denial of the application for a permit for the 2015 Cinco de Mayo Parade, and this offer is what Mr. Aguilera was referencing when he made his statement during the April 10th City Council meeting.

48) Mr. Aguilera made his statement in retaliation for Plaintiff Janet Wilson asserting in the letter that her First Amendment rights were violated by Defendant Velez and Defendant City of Pueblo.

## Other Parades

49) On May 12, 2015, Plaintiff Janet Wilson submitted a written request to the Pueblo Police Department under the Colorado Open Records Act (CORA) for records pertaining to every major parade and event in Pueblo, Colorado for the previous three years. On May 15, 2015, the City of Pueblo complied with Plaintiff Janet Wilson's CORA request and turned records over to her.

50) Upon review of the records provided to her on May 12, 2015, Plaintiff Janet Wilson discovered Defendant Velez had not required forty T-3 barricades for previous parades of a similar nature, nor for those parades predicted to have much larger and longer parades along parade routes with just as much or more traffic than the intended route for the 2015 Cinco de Mayo Parade along E. 8th Street.

51) Specifically, Plaintiff Janet Wilson discovered the following in her review of the records:

a)  Defendants did not require the organizers of the 2012 Cinco de Mayo Parade to have any barricades, even though the route for that parade was the same route approved and required by Defendant Velez for the 2015 Cinco de Mayo Parade.

b)  Defendants did not require the organizers of the 2013 Cinco de Mayo Parade to have any barricades, even though the route for that parade was the same route approved and required by Defendant Velez for the 2015 Cinco de Mayo Parade.

c)  Defendants required the organizers of the 2014 Kids Day Parade to have six Type 1 barricades, two Type 3 barricades, 300 cones and various "street closure" and "event in progress" warning signs. This parade route was along Abriendo Avenue and Evans Avenue, two main thoroughfares through central Pueblo. The 2014 Kids Day Parade had fifteen traffic control points along its route.

d)  Defendants required the organizers of the 2014 Fiesta Day Parade to have three Type 3 barricades, 550 traffic cones, and various "street closure" and "event in progress" warning signs. This parade was mostly along Northern Avenue, a very busy main thoroughfare through the south side of Pueblo. The parade had twenty-five traffic control points along its route.

52) On September 14, 2015, Plaintiff Janet Wilson submitted another CORA request to the records custodian for the City of Pueblo, Colorado, asking for records regarding reimbursement to the City from organizers of past parades for police overtime costs for "blocking intersections, traffic control, or any participation." (emphasis included) The

City responded to Plaintiff Janet Wilson's CORA request by providing her with an undated statement, copy attached as Exhibit 4, from Pueblo Police Sgt. Howard Jackson, who was head of the Traffic Division. Exhibit 4 reveals the following practices and policies of Defendant City of Pueblo:

a) That the organizers of the Colorado State Fair Parade, Fiesta Day Parade and the Kids Day Parade, which are parades occurring annually in the City of Pueblo, are not required to pay the expenses of barricades and other traffic control equipment, per direction of City Council.

b) The organizers of the Colorado State Fair Parade, Fiesta Day Parade and the Kids Day Parade were not required to pay police overtime costs for traffic control from 2012-2014.

c) Upon information and belief, the organizers of the Colorado State Fair Parade, Fiesta Day Parade and the Kids Day Parade have never been required to pay police overtime costs for traffic control and crowd safety.[5]

d) No parades in the ten years before May 1, 2015 were ever required to reimburse the City of Pueblo for police overtime costs for traffic control and crowd safety.

53) On information and belief, the Pueblo City Council, before May 1, 2015, had never passed an ordinance, resolution, motion or budget item exempting the organizers of the Colorado State Fair Parade, Fiesta Day Parade and the Kids Day Parade from paying

---

[5] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).

the expenses of barricades, other traffic control equipment or police overtime costs for
traffic control and crowd security for their parades.[6]

54) Neither Defendant Velez, Defendant City of Pueblo, the Pueblo City Manager or the
Director of Finance for the City of Pueblo ever informed Plaintiffs prior to the May 1,
2015 revocation by Defendant Velez of the Cinco de Mayo parade permit of the practice
of not requiring parades to reimburse the City for police overtime costs.

55) The practice by Defendant City of Pueblo, through its final policymakers, and
Defendant Velez of electing to not seek reimbursement for police overtime costs
constitutes a policy of Defendant City of Pueblo. Said policy, on its face, allows for the
exercise of unfettered discretion by the chief of police in setting permit conditions, such
as reimbursement of police overtime costs and payment for traffic control barricades,
and thus allows for content-based discrimination.

56) Plaintiff Janet Wilson attended several Pueblo parades after the revocation of the
Cinco de Mayo parade permit by Defendant Velez on May 1, 2015, and discovered the
following:

    a) Defendants did not require the organizers of the 2015 Fiesta Day Parade to have
       any barricades, even though the route for that parade was much longer and the
       parade much larger than what was planned for the 2015 Cinco de Mayo Parade.

---

[6] This factual allegation will likely have evidentiary support after a reasonable opportunity for further
investigation or discovery. See F.R.C.P. 11(b)(3).

b) Defendants did not require the organizers of the 2016 Cinco de Mayo Parade to have T-3 barricades, even though the route for that parade was the same route approved and required by Defendant Velez for the 2015 Cinco de Mayo Parade.

c) Defendants did not require the organizers of the 2016 Kids Day Parade to have any barricades, even though the route for that parade was much longer and the parade much larger than 2015 Cinco de Mayo Parade.

### Final Policymakers for the City of Pueblo

57) The Pueblo City Council is a final policymaker for Defendant City of Pueblo.

a) Defendant City of Pueblo is a political subdivision of the State of Colorado.

b) The Charter vests the City Council with legislative authority.

c) The City Council exercised its legislative authority by passing Pueblo's parade permitting ordinance into law.

d) The parade permitting ordinance passed into law was codified at Section 15-1-8(a)(14), Part 13, Sec. 1301.

58) The City Manager is a final policymaker for the City of Pueblo.

a) Section 4-1 of the Charter requires that the City Council appoint a City Manager "who shall be the Executive Head of the Municipal Government."

b) Section 4-5(b) of the Charter grants the City Manager the power, among other powers and duties, "to appoint, suspend and remove heads or directors of all bureaus, departments, and city employees."

c) Section 4-5(f) of the Charter states that, except as otherwise provided in the Charter, the City Manager shall "exercise supervision and control over all

executive and administrative departments and agencies created herein or that
may be hereafter created by the Council."

d) Section 4-5(c) of the Charter makes the City Manager responsible for preparing
the City's annual budget, submitting it to City Council for approval and for the
administration of the City's budget after its adoption by City Council.

e) Part II of Article 7 of the Charter creates a Department of Finance and the
position of Director of Finance.

f) The Director of Finance, per Section 7-18, "under the jurisdiction of the City
Manager, shall have charge of administration of the financial affairs of the City,"
and "[s]upervise and be responsible for disbursement of all monies to ensure that
budget appropriations are not exceeded, or payments illegally made."

g) Sections 4-6 and 10-1 of the Charter creates the Department of Police, headed
by the Chief of Police.

h) Section 4-7 of the Charter states that the head of the Police Department is
subject to the City Manager.

i) Sec. 1-5-6(d)(3) of the Code requires that department heads, which includes the
Finance Director and the Chief of Police, "[r]equisition moneys belonging to the
City only in the manner prescribed by law."

j) Section 4-4 of the Charter restricts the powers of City Council over department
heads, including the Chief of Police and the Director of Finance, by mandating
that "the Council and its members shall deal with the administrative service solely

through the City Manager and neither the Council nor any member thereof shall

give orders to any subordinates of the City Manager either publicly or privately."

59) By custom, the City Manager has delegated to the chief of police the authority to act

as a final policymaker for the City of Pueblo regarding the approval or denial of parade

permit applications.

a) Section 10-3 of the Charter states that the chief of police "shall make rules and

regulations with approval of the City Manager and in conformity with the

ordinances and resolutions of the City, concerning the operation of the

Department and conduct of all employees thereof."

b) Defendant Velez made no rule or regulation that contained any specific

standards for the setting of conditions on a parade permit,[7] but he set conditions

anyway.

c) Although the City Manager has supervision and control over the Police

Department, and although the chief of police is subject to the City Manager, the

City Manager has never meaningfully exercised that supervision or control over

the unfettered discretion that Section 15-1-8(a)(14), Part 13, Sec. 1301 of the

Code permits the chief of police to exercise regarding the granting or denial of

parade permit applications or the setting of conditions on parade permits.[8]

d) Although the Code states that a person aggrieved by the police chief's denial of a

parade permit application may appeal to the City Council, that provision of the

---

[7] This factual allegation will likely have evidentiary support after a reasonable opportunity for further
investigation or discovery. See F.R.C.P. 11(b)(3).
[8] This factual allegation will likely have evidentiary support after a reasonable opportunity for further
investigation or discovery. See F.R.C.P. 11(b)(3).

Code does not meaningfully constrain the chief of police and does not subject the chief of police to meaningful review because of the following:

i)   The Charter does not expressly grant to City Council the power to review the actions of the chief of police.

ii)  The Charter's provision granting City Council the authority to "provide for the issuance, suspension or revocation of licenses and permits" does not grant the City Council the right to hear and decide an appeal or review of the police chief's decision regarding an application for a parade permit nor does it create a process to do so.

iii) The Charter's provision granting City Council the authority to "provide for the issuance, suspension or revocation of licenses and permits" does not grant the City Council the right to hear and decide an appeal or review of the police chief's decision regarding an application for a parade permit because to do so would be contrary to the Charter's other provisions that the City Manager supervises and controls the police chief and that the City Council may not give any "orders to any subordinates of the City Manager either publicly or privately."

e)  Neither the Code nor the Charter create mandatory or formal review by the City Manager of the police chief's decision to deny a permit or for the setting of onerous and unfair conditions on a granted permit. Hence, neither the Charter nor the Code provide for any meaningful review process of the police chief's decisions to deny a permit application or the setting of onerous and unfair

conditions on a granted permit. Further, any applicant for a parade permit is not on notice of any process that they can follow for the review of the decisions of the chief of police by the City Manager.

### Defendant Velez

60) Defendant Velez's stated reason for pulling the permit for the 2015 Cinco de Mayo Parade was a sham, covering up his illegal exercise of discretion to deny Plaintiff Janet Wilson the opportunity to have the parade, as shown above by the different and onerous conditions that Defendant Velez set on Plaintiffs' parade permit application.

61) Defendants also held ill-will towards Plaintiff Janet Wilson, and that ill-will played into the decision of the chief of police to pull the permit for the 2015 Cinco de Mayo Parade.

62) Defendants' ill-will towards Plaintiff Janet Wilson is exemplified by the following:

a) On July 15, 2014, Pueblo Police Officer William Wells was dispatched to 2812 3rd Ave., the residence of Glen Burke, on a report that his adult son [Hal] had been stealing money and other items from Glen. The caller was a third-party acquaintance of Glen Burke who identified herself to dispatchers as Cynthia Rand. Officer Wells spoke with Mr. Burke's son, Hal Burke, who reported to the officer that he believed Janet Wilson was embezzling the money from his father and was trying to exercise total control over Glen`s personal finances.

b) On July 25, 2014, Glen Burke and Janet Wilson met with Pueblo Police Detective Ken Rhodes concerning the information that had been reported to Officer Wells by Hal Burke. Glen Burke reported to Detective Rhodes that he had not been

receiving his mail for quite some time, and it was reported to him by neighbors

that they had seen his son, Hal, taking his mail. Glen Burke also informed

Detective Rhodes that he believed his son had emptied out Glen's bank account.

c) On August 21, 2014, Detective Rhodes closed the investigation as there did not

appear to be any evidence of any criminal wrongdoing by anyone.

d) On October 27, 2014, Detective Rhodes picked up the investigation again after

persons named Sandra Baralla and Janet Altmann reported to him the following,

per his report, regarding Janet Wilson:

> Janet Wilson started this 501c (3) non-profit organization and is
> using the non-profit to gather free labor and supplies to refurbish the
> (three, 3) homes on the Eastside of Pueblo. Janet Altmann and
> Sandra Baralla believe that at some point Janet Wilson is going to
> just quit claim the homes over and into Janet Wilson`s name, sell the
> properties and leave town with as much cash as she can get out of
> the properties and including donations received from not only Glen
> Burke, but also Dr. Courtland and Cheryl Moore.

e) Subsequently, Ms. Baralla and Ms. Altmann made several additional allegations

to Detective Rhodes of criminal behavior by Janet Wilson. On March 2, 2015,

Detective Rhodes, after completing a thorough investigation of the many

allegations made against Janet Wilson by Ms. Baralla and Ms. Altmann, closed

the investigation as he believed the allegations were unfounded.

f) However, on March 12, 2015, Defendant Velez met with two individuals who

wanted to remain anonymous and who made similar allegations about Janet

Wilson that Detective Rhodes had already investigated. These two anonymous

individuals suggested to Defendant Velez that he conduct a background check

on Janet Wilson. Defendant Velez added this information to the report that
Detective Rhodes had compiled regarding his closed investigation into Janet
Wilson.

g) On May 1, 2015, at about 10:15 a.m., the very day that Defendant Velez granted
and then pulled the parade permit, Deputy Pueblo Police Chief Andy McLachlan
contacted Detective Rhodes and informed him that Defendant Velez wanted an
update of the investigation of Janet Wilson and wanted to know whether
Detective Rhodes had investigated the claims made that were stated in
Defendant Velez's supplemental report.

h) Detective Rhodes reviewed Defendant Velez's supplemental report and did not
find any allegations that he had not already investigated and found to be
baseless.

i) Detective Rhodes printed the case report and presented it to Defendant Velez to
have in his possession when the two anonymous reporting persons came back to
see what had happened with their claims of Janet Wilson's wrongdoing.

j) During this meeting between Detective Rhodes and Defendant Velez, and
despite the fact that Detective Rhodes had found the allegations against Janet
Wilson to be baseless, Defendant Velez asked Detective Rhodes a series of
questions about Janet Wilson regarding whether she had committed zoning
violations, what was the 501(c)(3) status of the non-profits she organized,
whether she had registered the nonprofits with the State of Colorado, the status
of property listings, etc., and whether she was a naturalized citizen or if she was

in the United States on a green card. Detective Rhodes told Defendant Velez that he did not know whether Janet Wilson was a US citizen, and so Defendant Velez suggested that Detective Rhodes contact I.C.E. in Colorado Springs and have them run Janet Wilson through their system even though Defendant Velez had no information at all to indicate that she was anything other than a citizen of the United States.

k) On May 4, 2015, Detective Rhodes once more closed the investigation of Janet Wilson when he discovered that Ms. Wilson was a naturalized US citizen.

## CAUSES OF ACTION

### Count One

### 42 U.S.C. § 1983: Violation of First Amendment Speech and Peaceful Assembly Rights

63) Plaintiffs incorporate by reference paragraphs 1 – 62 as if fully set forth herein.

64) The planned May 2, 2015 Cinco de Mayo Parade on E. 8th Street in Pueblo was a form of expressive speech protected by the First Amendment.

65) The planned May 2, 2015 Cinco de Mayo Parade on E. 8th Street in Pueblo was an opportunity for Cinco de Mayo Parade participants and observers to peacefully assemble, bring awareness to the public of the eastside's cultural richness and diversity, and celebrate the holiday.

66) Section 15-1-8(a)(14), Part 13, Sec. 1301, of the Code is an unconstitutional abridgment on its face, and as applied, of Plaintiffs' affirmative rights to freedom of

speech and peaceful assembly under the United States Constitution, First and Fourteenth Amendments.

67) Section 15-1-8(a)(14), Part 13, Sec. 1301, of the Code on its face and as applied is a content-based and viewpoint-based restriction on speech and the right to peacefully assemble.

68) As a direct and proximate result of the Defendants' violations of Plaintiffs' constitutional rights, Plaintiffs have suffered damages, including litigation expenses and attorney fees, loss of reputation, and other compensatory damages, and Plaintiff Janet Wilson has suffered loss of potential government grants for Pueblo House, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress, in an amount to be determined by a jury and the Court.

## Count Two

### 42 U.S.C. § 1983: Equal Protection

69) Plaintiffs incorporate by reference paragraphs 1 – 67 as if fully set forth herein.

70) Section 15-1-8(a)(14), Part 13, Sec. 1301 of the Code as applied to the 2015 Cinco de Mayo Parade, violated the Equal Protection Clause of the Fourteenth Amendment. Specifically but not exclusively, Section 15-1-8(a)(14), Part 13, Sec. 1301 of the Code as applied to the 2015 Cinco de Mayo Parade created at least three classes: one class consisting of the Colorado State Fair Parade, Fiesta Day Parade and the Kids Day Parade, one class consisting of the planned 2015 Cinco de Mayo Parade and another class consisting of all other parades.

71) These classifications have a direct bearing on the Plaintiffs' fundamental interest in free speech and peaceful assembly. Defendant City has no compelling interest justifying the creation of these classes by Section 15-1-8(a)(14), Part 13, Sec. 1301 of the Code and cannot show that these classifications are necessary to serve any legitimate governmental interest.

72) Section 15-1-8(a)(14), Part 13, Sec. 1301 of the Code as applied to the 2015 Cinco de Mayo Parade singled out Plaintiffs as a class to be specifically isolated from speech and peaceful assembly. This classification had a direct bearing on the fundamental interests in free speech and peaceful assembly. Defendants had no compelling interest justifying the creation of this class and cannot show that this classification was necessary to serve any legitimate governmental interest.

73) As a direct and proximate result of the Defendants' violations of Plaintiffs' constitutional rights, Plaintiffs have suffered damages, including litigation expenses and attorney fees, loss of reputation, and other compensatory damages, and Plaintiff Janet Wilson has suffered loss of potential government grants for Pueblo House, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress, in an amount to be determined by a jury and the Court.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on the issues raised in this Complaint.

DATED this 26th day of April, 2017.

Respectfully Submitted,

s/ Matthew S. Martin
_____
Matthew S. Martin
Gordon & Melun, PLLC
5500 E. Yale Ave., #300
Denver, Colorado 80222
Tel: 303-756-0800
Fax: 303-756-9315
Email: mmartin@gorlaw.com
Attorney for Plaintiffs Janet Wilson and
Eastside Action Support Team